

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-00078 |
| v. | ) | |
| | ) | 18 U.S.C. § 1343 |
| [1] ROBIN SMITH | ) | 18 U.S.C. § 1346 |
| | ) | 18 U.S.C. § 2 |
| | ) | 18 U.S.C. § 981 |

## INFORMATION

THE UNITED STATES CHARGES:

### BACKGROUND ALLEGATIONS

At all times material to this Information unless otherwise indicated:

1. Defendant **ROBIN SMITH** was a member of the Tennessee House of Representatives ("Tennessee House"), representing District 26, which included part of Hamilton County, Tennessee. **SMITH** was first elected to the Tennessee House in or around November 2018. **SMITH** also owned and operated a political consulting company called Company 1. Company 1 provided political consulting, mail, and project management services.

2. Individual 1 was a member of the Tennessee House, first elected in 2003. Individual 1 served as Speaker of the Tennessee House from in or around January 2019 until in or around August 2019. In or around August 2019, Individual 1 resigned as Speaker after a scandal became public. Individual 1 also owned and operated a political consulting company called Company 2. Individual 1 started Company 2 in or around October 2019 to provide fundraising services to Political Party 1 lawmakers.

3. Individual 2 was a businessman and former Chief of Staff to Individual 1 when Individual 1 was Tennessee House Speaker. In 2019, multiple news forums published allegations that Individual 2 had committed inappropriate and illegal conduct. Based on public reporting,

Individual 2 admitted certain allegations, and, on or about May 3, 2019, Individual 2 resigned his position as Chief of Staff.

4. The State of Tennessee ("the State") allocated Tennessee Representatives $3,000 annually to fund postage and printing of items to be sent to the legislators' constituents ("the Mailer Program"). According to Tennessee House guidelines, Representatives were permitted to use Mailer Program funds to design and mail "legislative update mailers" and legislative surveys to their constituents. Representatives were permitted to use campaign funds to offset additional expenses beyond the $3,000 allocated under the Mailer Program.

5. The Tennessee House Speaker's Office had the authority to approve or deny a vendor to provide services or any mailing funded by the Mailer Program.

6. In or around November 2019, Individual 2 established Phoenix Solutions, LLC. Phoenix Solutions was established, with **SMITH** and Individual 1's knowledge and support, for the purpose of offering mail and consulting services for legislative members facing primary challengers, and was later expanded to offer constituent mail services to members of the Tennessee General Assembly. **SMITH**, Individual 1, and Individual 2 told others, including members of the Tennessee General Assembly and the House Speaker's Office, that Phoenix Solutions was run by an individual named "Matthew Phoenix." **SMITH**, Individual 1, and Individual 2 claimed that Matthew Phoenix was an experienced political consultant who had worked for Consulting Firm 1, a real company based in Washington, D.C. In truth and in fact, Individual 2 ran Phoenix Solutions and **SMITH**, Individual 1, and Individual 2 profited from it.

7. **SMITH**, Individual 1, and Individual 2 knew that Matthew Phoenix was a fictitious person and was, in truth and in fact, Individual 2.

2

8. **SMITH**, Individual 1, and Individual 2 concealed Individual 2's involvement in Phoenix Solutions from the State and members of the Tennessee General Assembly due to the expectation that Phoenix Solutions would not be approved by the Tennessee House Speaker's Office, acting on behalf of the State, or hired as a vendor by individual members if Individual 2's involvement was disclosed. **SMITH**, Individual 1, and Individual 2 also concealed the fact that Individual 2 kicked back a portion of the profits from the State and members of the Tennessee General Assembly to **SMITH** and Individual 1 due to the expectation that Phoenix Solutions would not be approved by the Tennessee House Speaker's Office, acting on behalf of the State, or hired as a vendor by individual members if Individual 2's operational involvement and financial interests in the business and the kickbacks to **SMITH** and Individual 1 were disclosed.

9. **SMITH** and Individual 1 received kickbacks from Individual 2 in exchange for using their positions as members of the Tennessee House of Representatives to perform official acts, including pressuring the Tennessee House Speaker's Office to approve Phoenix Solutions as a Mailer Program vendor and disburse State funds to Phoenix Solutions.

10. Individual 2, with **SMITH** and Individual 1's knowledge and support, set up an email account for Matthew Phoenix, matthew@powerofphoenix.com, which Individual 2 used to conduct business on behalf of Phoenix Solutions.

11. Individual 2 incorporated Phoenix Solutions as a limited liability company (LLC) in New Mexico. Individual 2 set up a United States Postal Service post office box for Phoenix Solutions there and forwarded the mail received by that post office box to his home address in Nashville. Individual 2 later explained to **SMITH** that he established the post office box in New Mexico because that state allows the anonymous registration of LLCs.

12. In or around January 2020, **SMITH** was informed by an employee of the Tennessee House Speaker's Office that the Speaker's Office needed to work directly with the third-party vendor, which was a change in the existing guidelines employed by legislative members for constituent mail. **SMITH** informed Individual 2 of this fact. Individual 2 was notified that the State could not pay Phoenix Solutions without an Internal Revenue Service Form W-9 on file. In response, Individual 2, assuming the identity of Matthew Phoenix to disguise his true identity, sent a W-9 signed by "Matthew Phoenix" from the matthew@powerofphoenix.com email address to the Tennessee House Majority Caucus Advisor for the purpose of filing it with the State.

13. On or about December 18, 2019, **SMITH** emailed Individual 2. Referencing a potential future conversation related to Phoenix Solutions with a Political Party 1 employee regarding a campaign mailing list that each incumbent legislative member was to receive, **SMITH** told Individual 2 that he "may have to assume the role of Matthew again." Individual 2 replied to **SMITH**, "Matthew, reporting for duty!" and included a graphic interchange format (".gif") picture of a salute from Harrison Ford's character Han Solo in the movie Star Wars.

14. On or about January 24, 2020, **SMITH** emailed Individual 2, writing, "We'll start with this...Matthew...you might expect some type of call, email." Below, **SMITH** copied an email chain between **SMITH**, the Acting Chief of Staff to the House Speaker, and the General Assembly's Director of Legislation. In the email chain, **SMITH** asked the officials about the status of Mailer Program payments to Phoenix Solutions and why there was an issue with processing them. The Acting Chief of Staff wrote **SMITH**, "I'm on it." **SMITH** replied, "Don't crush her, but [the Director of Legislation has] been telling this vendor that the check's on the way for about two weeks." **SMITH** falsely added, "It's guys from [Consulting Firm 1] who did mail two years

ago that left and started their own gig...tired of doing the DC/Trump stuff. Thanks." **SMITH** then forwarded the email chain to Individual 2, adding the message, "Shhhhhhhhhh."

15. Individual 3 was Individual 2's girlfriend. At times, Individual 3 assumed the fictitious role of "Candice," another alleged employee of Phoenix Solutions.

16. On or about June 16, 2020, Individual 3 and Individual 2 emailed each other as "Candice" and "Matthew." The purpose of the email exchange was to falsely make it appear as if two employees of Phoenix Solutions were having an exchange about the need to secure payment on outstanding Mailer Program invoices that the State had not yet paid. Individual 2, using the matthew@powerofphoenix.com email account, then forwarded the exchange to **SMITH**.

17. On or about June 22, 2020, **SMITH** emailed the General Assembly's Director of Legislation, copying the Acting Chief of Staff to the House Speaker, to complain about delays in Mailer Program payments from the State to Phoenix Solutions. **SMITH** forwarded them the June 16, 2020, email exchange between "Candice" and "Matthew" complaining about the delayed payments. Above that email chain, **SMITH** wrote, "[Director of Legislation], I was cc'd on this last week. . . . It would be either illegal or unethical to move to print without knowing payment was coming, so the bulk permit number is provided on the invoice. Simpler, asking a firm to be liable for the cost with the printing completed before knowing payment may or may not be approved is suspect. Is there something going on?" Enclosed within **SMITH**'s email were invoices from Phoenix Solutions for legislative mailers on behalf of two Representatives, for $4,547.50 and $5,537.

18. On or about May 20, 2020, **SMITH** discussed Phoenix Solutions with a member of the Tennessee House Political Party 1 caucus. **SMITH** described Phoenix Solutions as her preferred survey mailer company. **SMITH** falsely said that Phoenix Solutions was owned and

5

operated by Matthew Phoenix, an experienced political consultant with whom **SMITH** did business when **SMITH** used Washington, D.C.-based Consulting Firm 1 for political work. **SMITH** falsely said that Matthew Phoenix and his associate, Candice, got tired of living in the Washington, D.C. area and decided to move back home to New Mexico, where Phoenix started Phoenix Solutions. **SMITH** falsely said that she used Phoenix Solutions because of the quality of its work.

19. On or about August 10, 2020, **SMITH** attended a meeting of the Political Party 1 House campaign committee. Present at the meeting were several Tennessee Representatives, officials from the Speaker's Office, and a committee consultant. **SMITH** repeated the same false statements regarding Phoenix Solutions that she had made to the caucus member on or about May 20, 2020. She also falsely told the committee members that she did not make any money from Phoenix Solutions.

20. On or about April 2, 2020, Individual 2 sent an email to **SMITH** and Individual 1. The email stated, "Friends, Here's our up-to-date printing spreadsheet. All of these checks have been collected and deposited. All bills related to these print jobs have also been paid. So, let me know what address is best for you and I will cut checks for each of you?" Individual 2 provided a breakdown of total profit earned from each client. **SMITH**, Individual 1, and Individual 2 shared the profits, with Individual 2 earning 30%. Individual 1 and **SMITH** each earned $4,143.64, which was 25% of the business, each. Individual 2 wrote that the remaining 20% of the profit was "left in business." Individual 2 also discussed ways to cut Phoenix Solutions' future costs.

21. From on or about June 1, 2020, through on or about December 1, 2020, Phoenix Solutions took on more varied projects, but continued to receive payments from the State-funded Mailer Program and campaign accounts of members of the General Assembly. During that

6

timeframe, a Phoenix Solutions bank account ending in x3886 received revenue of approximately $158,165, excluding payments from campaign accounts associated with **SMITH** and Individual 1. From on or about January 1, 2020, through on or about December 31, 2020, Phoenix Solutions, Company 1, and Company 2 received approximately $51,947 from the State in payments associated with the Mailer Program.

22. On or about September 10, 2020, **SMITH** endorsed and deposited check number 152, dated September 1, 2020, in the amount of $12,003.16, from Phoenix Solutions' account number x3886 into a bank account associated with her consulting firm, Company 1. Individual 2 signed the check in his given name and wrote "Consulting" on the memo line.

23. On or about December 17, 2020, **SMITH** endorsed and deposited check number 170, dated December 16, 2020, in the amount of $12,116.96, from Phoenix Solutions' account number x3886 into a bank account associated with Company 1. Individual 2 signed the check in his given name and wrote "Consulting" on the memo line.

## COUNT ONE
## 18 U.S.C. §§ 1343, 1346
## (Honest Services Wire Fraud)

24. Paragraphs 1 through 23 are incorporated and realleged as if fully set forth herein.

25. Beginning in or around November 2019 and continuing until in or around January 2021, in the Middle District of Tennessee and elsewhere, the Defendant,

**ROBIN SMITH,**

aided and abetted by others, including Individual 1 and Individual 2, devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the Middle District of Tennessee and the government of Tennessee of their right to the honest services of a public official, namely the honest services of **SMITH** and Individual 1, members of the Tennessee House of Representatives, through kickbacks.

7

26. In the Middle District of Tennessee and elsewhere, **SMITH**, aided and abetted by others, including Individual 1 and Individual 2, having devised and intended to devise the above-described scheme, and for the purpose of executing the scheme, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds.

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

### FORFEITURE ALLEGATION

1. The allegations contained in this Information are re-alleged and incorporated by reference as if fully set forth in support of this forfeiture.

2. Upon conviction of Count One of this Information, the defendant, **ROBIN SMITH**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), by Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including but not limited to a money judgment in an amount to be determined representing the value of the proceeds of the offense.

3. If any of the property described above, as a result of any act or omission of **SMITH**:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty, the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by

reference in Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of **SMITH** up to the value of the property listed above as being subject to forfeiture.

MARK H. WILDASIN
UNITED STATES ATTORNEY
MIDDLE DISTRICT OF TENNESEE

*/s/ Amanda J. Klopf*
AMANDA J. KLOPF
ASSISTANT UNITED STATES ATTORNEY

COREY R. AMUNDSON
CHIEF, PUBLIC INTEGRITY SECTION

*/s/ John P. Taddei*
JOHN P. TADDEI
TRIAL ATTORNEY