**ORDER**

The plea of guilty is accepted.
The recommendations in the
plea agreement are reserved
until the time of sentencing.

*Eli Richardson*
U.S.D.J.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-cr-00078 |
| v. | ) | Judge Richardson |
| | ) | |
| ROBIN SMITH | ) | |

## PLEA AGREEMENT

The United States of America, through Mark H. Wildasin, United States Attorney for the Middle District of Tennessee, Assistant United States Attorney Amanda J. Klopf, Corey R. Amundson, Chief of the Public Integrity Section of the U.S. Department of Justice, and John P. Taddei, Trial Attorney (collectively, "United States" or "government"), and defendant, Robin Smith, through defendant's counsel, W. David Bridgers and Ben M. Rose, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, have entered into an agreement, the terms and conditions of which are as follows:

### Charges in This Case

1.      Defendant acknowledges that she has been charged in the Information in this case with one count of Honest Services Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, which carries the following maximum penalties: up to twenty years' imprisonment; a term of supervised release of not more than three years; a fine not to exceed $250,000; and a mandatory special assessment of $100.

2.      Defendant has read the charge against her contained in the Information, and that charge has been fully explained to her by her attorneys. Defendant fully understands the nature and elements of the crime with which she has been charged.

3.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the Information, charging Honest Services Wire Fraud. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

### Acknowledgements and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

4.     This Plea Agreement is entirely voluntary and represents the entire agreement between the United States and defendant regarding defendant's criminal liability in case No. 3:22-cr-00078.

5.     Defendant understands that by pleading guilty she surrenders certain trial rights, including the following:

    a.     If defendant persisted in a plea of not guilty to the charge against her, she would have the right to a public and speedy trial. Defendant has a right to a jury trial, and the trial would be by a judge rather than a jury only if defendant, the government, and the Court all agreed to have no jury.

    b.     If the trial were a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and her attorney would have a say in who the jurors would be by removing prospective jurors for cause, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent; that the government bears the burden of proving defendant guilty of the charges beyond a reasonable doubt; and that it must consider each count of the indictment against defendant separately.

2

c.     If the trial were held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

d.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and her attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence on her own behalf. If the witnesses for defendant would not appear voluntarily, she could require their attendance through the subpoena power of the Court.

e.     At a trial, defendant would have a privilege against self-incrimination so that she could testify or decline to testify, and no inference of guilt could be drawn from her refusal to testify.

6.     Defendant understands that by pleading guilty she is waiving all of the trial rights set forth in the prior paragraph. Defendant's attorney has explained those rights to her, and the consequences of her waiver of those rights.

<u>Factual Basis</u>

7.     Defendant will plead guilty because she is in fact guilty of the charge contained in Count One of the Information. In pleading guilty, defendant admits the following facts and that those facts establish her guilt beyond a reasonable doubt:

a.     Defendant ROBIN SMITH was a member of the Tennessee House of Representatives ("Tennessee House"), representing District 26, which included part of Hamilton County, Tennessee. SMITH was first elected to the Tennessee House in or around November 2018. SMITH also owned and operated a political consulting company

called Company 1. Company 1 provided political consulting, mail, and project management services.

b.      Individual 1 was a member of the Tennessee House, first elected in 2003. Individual 1 served as Speaker of the Tennessee House from in or around January 2019 until in or around August 2019. In or around August 2019, Individual 1 resigned as Speaker after a scandal became public. Individual 1 also owned and operated a political consulting company called Company 2. Individual 1 started Company 2 in or around October 2019 to provide fundraising services to Political Party 1 lawmakers.

c.      Individual 2 was a businessman and former Chief of Staff to Individual 1 when Individual 1 was Tennessee House Speaker. In 2019, multiple news forums published allegations that Individual 2 had committed inappropriate and illegal conduct. Based on public reporting, Individual 2 admitted certain allegations, and, on or about May 3, 2019, Individual 2 resigned his position as Chief of Staff.

d.      The State of Tennessee ("the State") allocated Tennessee Representatives $3,000 annually to fund postage and printing of items to be sent to the legislators' constituents ("the Mailer Program"). According to Tennessee House guidelines, Representatives were permitted to use Mailer Program funds to design and mail "legislative update mailers" and legislative surveys to their constituents. Representatives were permitted to use campaign funds to offset additional expenses beyond the $3,000 allocated under the Mailer Program.

e.      The Tennessee House Speaker's Office had the authority to approve or deny a vendor to provide services or any mailing funded by the Mailer Program.

4

f.      In or around November 2019, Individual 2 established Phoenix Solutions, LLC.  Phoenix Solutions was established, with SMITH and Individual 1's knowledge and support, for the purpose of offering mail and consulting services for legislative members facing primary challengers, and was later expanded to offer constituent mail services to members of the Tennessee General Assembly. SMITH, Individual 1, and Individual 2 told others, including members of the Tennessee General Assembly and the House Speaker's Office, that Phoenix Solutions was run by an individual named "Matthew Phoenix." SMITH, Individual 1, and Individual 2 claimed that Matthew Phoenix was an experienced political consultant who had worked for Consulting Firm 1, a real company based in Washington, D.C. In truth and in fact, Individual 2 ran Phoenix Solutions and SMITH, Individual 1, and Individual 2 profited from it.

g.      SMITH, Individual 1, and Individual 2 knew that Matthew Phoenix was a fictitious person and was, in truth and in fact, Individual 2.

h.      SMITH, Individual 1, and Individual 2 concealed Individual 2's involvement in Phoenix Solutions from the State and members of the Tennessee General Assembly due to the expectation that Phoenix Solutions would not be approved by the Tennessee House Speaker's Office, acting on behalf of the State, or hired as a vendor by individual members if Individual 2's involvement was disclosed. SMITH, Individual 1, and Individual 2 also concealed the fact that Individual 2 kicked back a portion of the profits from the State and members of the Tennessee General Assembly to SMITH and Individual 1 due to the expectation that Phoenix Solutions would not be approved by the Tennessee House Speaker's Office, acting on behalf of the State, or hired as a vendor by

5

individual members if Individual 2's operational involvement and financial interests in the business and the kickbacks to SMITH and Individual 1 were disclosed.

      i.      SMITH and Individual 1 received kickbacks from Individual 2 in exchange for using their positions as members of the Tennessee House of Representatives to perform official acts, including pressuring the Tennessee House Speaker's Office to approve Phoenix Solutions as a Mailer Program vendor and disburse State funds to Phoenix Solutions.

      j.      Individual 2, with SMITH and Individual 1's knowledge and support, set up an email account for Matthew Phoenix, matthew@powerofphoenix.com, which Individual 2 used to conduct business on behalf of Phoenix Solutions.

      k.      Individual 2 incorporated Phoenix Solutions as a limited liability company (LLC) in New Mexico. Individual 2 set up a United States Postal Service post office box for Phoenix Solutions there and forwarded the mail received by that post office box to his home address in Nashville. Individual 2 later explained to SMITH that he established the post office box in New Mexico because that state allows the anonymous registration of LLCs.

      l.      In or around January 2020, SMITH was informed by an employee of the Tennessee House Speaker's Office that the Speaker's Office needed to work directly with the third-party vendor, which was a change in the existing guidelines employed by legislative members for constituent mail. SMITH informed Individual 2 of this fact. Individual 2 was notified that the State could not pay Phoenix Solutions without an Internal Revenue Service Form W-9 on file. In response, Individual 2, assuming the identity of Matthew Phoenix to disguise his true identity, sent a W-9 signed by "Matthew Phoenix"

6

from the matthew@powerofphoenix.com email address to the Tennessee House Majority Caucus Advisor for the purpose of filing it with the State.

m.      On or about December 18, 2019, SMITH emailed Individual 2. Referencing a potential future conversation related to Phoenix Solutions with a Political Party 1 employee regarding a campaign mailing list that each incumbent legislative member was to receive, SMITH told Individual 2 that he "may have to assume the role of Matthew again." Individual 2 replied to SMITH, "Matthew, reporting for duty!" and included a graphic interchange format (".gif") picture of a salute from Harrison Ford's character Han Solo in the movie Star Wars.

n.      On or about January 24, 2020, SMITH emailed Individual 2, writing, "We'll start with this...Matthew...you might expect some type of call, email." Below, SMITH copied an email chain between SMITH, the Acting Chief of Staff to the House Speaker, and the General Assembly's Director of Legislation. In the email chain, SMITH asked the officials about the status of Mailer Program payments to Phoenix Solutions and why there was an issue with processing them. The Acting Chief of Staff wrote SMITH, "I'm on it." SMITH replied, "Don't crush her, but [the Director of Legislation has] been telling this vendor that the check's on the way for about two weeks." SMITH falsely added, "It's guys from [Consulting Firm 1] who did mail two years ago that left and started their own gig...tired of doing the DC/Trump stuff. Thanks." SMITH then forwarded the email chain to Individual 2, adding the message, "Shhhhhhhhhh."

o.      Individual 3 was Individual 2's girlfriend. At times, Individual 3 assumed the fictitious role of "Candice," another alleged employee of Phoenix Solutions.

7

p.      On or about June 16, 2020, Individual 3 and Individual 2 emailed each other as "Candice" and "Matthew." The purpose of the email exchange was to falsely make it appear as if two employees of Phoenix Solutions were having an exchange about the need to secure payment on outstanding Mailer Program invoices that the State had not yet paid. Individual 2, using the matthew@powerofphoenix.com email account, then forwarded the exchange to SMITH.

q.      On or about June 22, 2020, SMITH emailed the General Assembly's Director of Legislation, copying the Acting Chief of Staff to the House Speaker, to complain about delays in Mailer Program payments from the State to Phoenix Solutions. SMITH forwarded them the June 16, 2020, email exchange between "Candice" and "Matthew" complaining about the delayed payments. Above that email chain, SMITH wrote, "[Director of Legislation], I was cc'd on this last week. . . . It would be either illegal or unethical to move to print without knowing payment was coming, so the bulk permit number is provided on the invoice. Simpler, asking a firm to be liable for the cost with the printing completed before knowing payment may or may not be approved is suspect. Is there something going on?" Enclosed within SMITH's email were invoices from Phoenix Solutions for legislative mailers on behalf of two Representatives, for $4,547.50 and $5,537.

r.      On or about May 20, 2020, SMITH discussed Phoenix Solutions with a member of the Tennessee House Political Party 1 caucus. SMITH described Phoenix Solutions as her preferred survey mailer company. SMITH falsely said that Phoenix Solutions was owned and operated by Matthew Phoenix, an experienced political consultant with whom SMITH did business when SMITH used Washington, D.C.-based

Consulting Firm 1 for political work. SMITH falsely said that Matthew Phoenix and his associate, Candice, got tired of living in the Washington D.C. area and decided to move back home to New Mexico, where Phoenix started Phoenix Solutions. SMITH falsely said that she used Phoenix Solutions because of the quality of its work.

s.     On or about August 10, 2020, SMITH attended a meeting of the Political Party 1 House campaign committee. Present at the meeting were several Tennessee Representatives, officials from the Speaker's Office, and a committee consultant. SMITH repeated the same false statements regarding Phoenix Solutions that she had made to the caucus member on May 20, 2020. She also falsely told the committee members that she did not make any money from Phoenix Solutions.

t.     On or about April 2, 2020, Individual 2 sent an email to SMITH and Individual 1. The email stated, "Friends, Here's our up-to-date printing spreadsheet. All of these checks have been collected and deposited. All bills related to these print jobs have also been paid. So, let me know what address is best for you and I will cut checks for each of you?" Individual 2 provided a breakdown of total profit earned from each client. SMITH, Individual 1, and Individual 2 shared the profits, with Individual 2 earning 30%. Individual 1 and SMITH each earned $4,143.64, which was 25% of the business, each. Individual 2 wrote that the remaining 20% of the profit was "left in business." Individual 2 also discussed ways to cut Phoenix Solutions' future costs.

u.     From on or about June 1, 2020, through on or about December 1, 2020, Phoenix Solutions took on more varied projects, but continued to receive payments from the State-funded Mailer Program and campaign accounts of members of the General Assembly. During that timeframe, a Phoenix Solutions bank account ending in x3886

9

received revenue of approximately $158,165, excluding payments from campaign accounts associated with SMITH and Individual 1. From on or about January 1, 2020, through on or about December 31, 2020, Phoenix Solutions, Company 1, and Company 2 received approximately $51,947 from the State in payments associated with the Mailer Program.

v. On or about September 10, 2020, SMITH endorsed and deposited check number 152, dated September 1, 2020, in the amount of $12,003.16, from Phoenix Solutions' account number x3886 into a bank account associated with her consulting firm, Company 1. Individual 2 signed the check in his given name and wrote "Consulting" on the memo line.

w. On or about December 17, 2020, SMITH endorsed and deposited check number 170, dated December 16, 2020, in the amount of $12,116.96, from Phoenix Solutions' account number x3886 into a bank account associated with Company 1. Individual 2 signed the check in his given name and wrote "Consulting" on the memo line.

x. The Speaker's Office would not have approved any constituent mail services performed by Phoenix Solutions if Individual 2's ownership of Phoenix Solutions had been disclosed because of Individual 2's history of misconduct as Chief of Staff to Individual 1. Further, multiple members of the General Assembly would not have hired Phoenix Solutions for Mailer Program or campaign work if they had known that Individual 2 was involved in the operation of Phoenix Solutions and that SMITH, Individual 1, and Individual 2 were secretly profiting from Phoenix Solutions.

z. **SMITH**, aided and abetted by others, including Individual 1 and Individual 2, having devised and intended to devise the above-described scheme, and for the purpose

of executing the scheme, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds.

8. This statement of facts is provided to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture and to assess relevant conduct for purposes of the United States Sentencing Guidelines. The statement of facts does not contain each and every fact known to defendant and to the United States concerning defendant's and/or others' involvement in the offense conduct and other matters.

<u>Sentencing Guidelines Calculations</u>

9. The parties understand that the Court will take account of the United States Sentencing Guidelines (hereinafter "U.S.S.G."), together with the other sentencing factors set forth at 18 U.S.C. § 3553(a), and will consider the U.S.S.G. advisory sentencing range in imposing defendant's sentence. The parties agree that the U.S.S.G. to be considered in this case are those effective November 1, 2018.

10. For purposes of determining the U.S.S.G. advisory sentencing range, the United States and defendant agree to recommend to the Court, pursuant to Rule 11(c)(1)(B), the following:

a. Offense Level Calculations.

i. The base offense level for the count of conviction and relevant conduct is 14, pursuant to U.S.S.G. § 2C1.1(a)(1).

ii. Assuming defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the government, through her allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). If the offense level is 16 or greater, assuming defendant accepts responsibility as described in the previous sentence,

the United States will move for an additional one-level reduction pursuant to U.S.S.G § 3E1.1(b), because defendant will have given timely notice of her intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.

        iii.     There are no further agreements as to the applicability of other sections and subsections of the U.S.S.G.

    b.     Criminal History Category.

        i.     The parties have no agreement as to Defendant's criminal history.

    c.     Defendant is aware that any estimate of the offense level or guidelines range that defendant may have received from defendant's counsel, the United States, or the Probation Office is a prediction, not a promise, and is not binding on the Probation Office or the Court. Defendant understands that the Probation Office will conduct its own investigation and make its own recommendations, that the Court ultimately determines the facts and law relevant to sentencing, that the Court's determinations govern the final guidelines calculations, and that the Court determines both the final offense level and the final guidelines range. Defendant likewise understands that the guidelines range as ultimately determined by the Court prior to any downward departure (the "court-determined guidelines range") may be based on an offense level different from that agreed to above. Accordingly, the validity of this agreement is not contingent upon the Probation Officer's or the Court's concurrence with the above calculations. In the event that the Probation Office or the Court contemplates any U.S.S.G. adjustments, departures, or calculations different from those recommended above, the parties reserve the right to

answer any inquiries and to make all appropriate arguments concerning the same. Defendant further acknowledges that if the Court does not accept the guidelines calculations of the parties, defendant will have no right to withdraw her guilty plea.

Cooperation

11.     Defendant agrees to cooperate fully and truthfully with the United States and to provide all information known to her regarding any criminal activity. In that regard:

a.     Defendant agrees to respond truthfully and completely to any and all questions that may be put to her, whether in interviews, before a grand jury, or at any trial(s) or other court proceedings.

b.     Defendant agrees to be reasonably available for debriefings and pre-trial conferences as the United States may require.

c.     Defendant agrees to produce voluntarily any and all documents, records, writings, or materials of any kind in her possession or under her care, custody, or control relating directly or indirectly to all areas of inquiry and investigation.

d.     Defendant consents to continuances of her sentencing hearing as requested by the United States.

12.     Nothing in this Plea Agreement requires the government to accept any cooperation or assistance that defendant may choose to proffer. The decision as to whether and how to use any information and/or cooperation that defendant provides (if at all) is in the exclusive discretion of the United States.

13.     Defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes. Defendant understands that if she falsely implicates an innocent person in the commission of a crime, or exaggerates the

involvement of any person in the commission of a crime in order to appear cooperative, or if defendant falsely minimizes the involvement of any person in the commission of a crime in order to protect that person, then defendant will be in violation of the Plea Agreement. Should the United States determine that defendant has failed to cooperate fully, has intentionally given false, misleading, or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this Plea Agreement, the United States, may in its discretion and as appropriate in light of particular circumstances: (1) prosecute defendant for perjury, false declarations or statements, and obstruction of justice; (2) prosecute any other crime alleged in the indictment that would have otherwise been dismissed at sentencing; (3) charge defendant with other crimes; and (4) recommend a sentence up to the statutory maximum.

14. This Plea Agreement is not conditioned upon charges being brought against any other individual. This Plea Agreement is not conditioned upon any outcome in any pending investigation. This Plea Agreement is not conditioned upon any result in any future prosecution that may occur because of defendant's cooperation. This Plea Agreement is conditioned upon defendant providing full, complete, and truthful cooperation.

15. If the United States in its sole discretion determines that defendant has cooperated fully, provided substantial assistance to law enforcement authorities, and otherwise complied with the terms of this Plea Agreement, prior to sentencing the government shall file a motion pursuant to U.S.S.G. § 5K1.1 with the Court setting forth the nature and extent of defendant's cooperation. Defendant understands that at the time this Plea Agreement is entered, no one has promised that a substantial assistance motion will be made on defendant's behalf.

16. The United States cannot, and does not, make any promise or representation as to what sentence defendant will receive. The United States will inform the Probation Office and the

Court of (a) this Plea Agreement; (b) the nature and extent of defendant's activities with respect to this case and all other activities of defendant that the United States deems relevant to sentencing; and (c) the nature and extent of defendant's cooperation.

<u>Other Agreements Relating to Sentencing</u>

17. If the government determines, in its sole discretion, that defendant has provided substantial assistance to the government in the investigation and prosecution of another person who has committed an offense, then the government shall move the Court to depart downward from the court-determined guidelines range pursuant to U.S.S.G. § 5K1.1. In that case, the government, in its sole discretion, also may recommend that the Court impose a particular sentence or depart downward to a particular extent. Defendant understands that the decision whether, and to what extent, to depart below the court-determined guidelines range rests solely with the Court.

18. Each party is free to recommend whatever sentence it feels is appropriate.

19. Defendant understands that if the government does not move the Court to depart downward from the court-determined guidelines range pursuant to U.S.S.G. § 5K1.1, the Court shall impose a sentence taking into consideration the court-determined guidelines range together with other sentencing factors. Defendant may not withdraw her plea of guilty because the government has determined not to make a motion pursuant to U.S.S.G. § 5K1.1.

20. It is understood by the parties that the Court is neither a party to nor bound by this Plea Agreement and, after consideration of the U.S.S.G., may impose the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw her guilty plea. Similarly, defendant understands that any recommendation by the Court related to location of imprisonment is not binding on the Bureau of Prisons.

21.     Defendant agrees to pay the special assessment of $100 at the time of sentencing to the Clerk of the U.S. District Court.

## Forfeiture of Property

22.     The Information provided notice to Defendant of the United States' intent to seek forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), of any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including a money judgment representing the value of such proceeds. By entry of a guilty plea to Count One of the information, Defendant acknowledges that the property identified above is subject to forfeiture.

23.     The United States will move for entry of a consent order of forfeiture consisting of a money judgment in an amount to be determined prior to sentencing.

24.     Any forfeiture payments made by any other defendant guilty of the same offense shall be credited to Defendant's forfeiture liability and vice versa.

25.     Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. Defendant acknowledges that the ultimate discretion lies with the Money Laundering and Asset Recovery Section of the U.S. Department of Justice regarding whether to grant or deny any request related to the remission or restoration process.

26.     Defendant further acknowledges that the United States is entitled to forfeiture of substitute property in the amount of the aforementioned forfeitable property, and therefore, agrees to the forfeiture of substitute assets, including forfeiture of any funds recovered via the Treasury Offset Program, and entry of an order allowing the United States to conduct any discovery proper in identifying, locating or disposing of the property subject to forfeiture, including depositions,

interrogatories, requests for production of documents and the issuance of subpoenas, without further application to the Court and to facilitate the identification and location of property declared forfeited, substitute assets, and to facilitate the disposition of any petitions for remission, mitigation or restoration.

27. Defendant further agrees to cooperate fully and to execute any supplementary documents, including authorizing the United States to obtain Defendant's credit report, and to take any additional actions that may be necessary or appropriate to effect this agreement as to forfeiture and substitute assets.

28. Defendant further authorizes the United States Probation and Pretrial Services Office (U.S.P.O.) to release the Presentence Investigative Report and all financial documents pertaining to Defendant to the Asset Forfeiture Unit of the United States Attorney's Office ("AF Unit") for the Middle District of Tennessee.

29. Defendant further authorizes the release to the AF Unit of his financial statement submitted to the Court in her application for pro bono attorney.

30. Defendant further authorizes the Internal Revenue Service to Release her tax returns for the years beginning 2020 through the pendency of the payment of the full amount of the Order of Forfeiture.

31. Defendant and the United States agree that every effort will be made to credit any payment toward forfeiture against both the Order of Forfeiture and any restitution order via the remission and restoration process prescribed in 28 C.F.R. § 9 and 18 U.S.C. § 3664, respectively. However, the parties acknowledge that the ultimate discretion lies with the Money Laundering and Asset Recovery Section of the U.S. Department of Justice regarding whether to grant or deny any request related to the remission or restoration.

## Presentence Investigation Report/Post-Sentence Supervision

32.     Defendant understands that the United States, in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing, shall fully apprise the District Court and the United States Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against her, as well as any related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

33.     Defendant agrees to execute truthfully and completely a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the United States Probation Office, and the United States regarding all details of her financial circumstances, including her recent income tax returns as specified by the Probation Officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 and enhancement of her sentence for obstruction of justice under U.S.S.G. § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

34.     This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Plea Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Plea Agreement are limited to the United States Attorney's Office for the Middle District of Tennessee and the Public Integrity Section and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Plea Agreement.

35.     Defendant understands that nothing in this Plea Agreement shall limit the Internal Revenue Service (IRS) in its collection of any taxes, interest, or penalties from defendant and her spouse or defendant's partnership or corporations.

Entry of Guilty Plea

36.     The parties jointly request that the Court accept the defendant's plea of guilty as set forth in this agreement and enter an order reflecting the acceptance of the plea while reserving acceptance of this plea agreement until receipt of the pre-sentence report and sentencing.

Waiver of Appellate Rights

37.     Regarding the issue of guilt, defendant hereby waives all (i) rights to appeal any issue bearing on the determination of whether she is guilty of the crime to which she is agreeing to plead guilty; and (ii) trial rights that might have been available if she exercised her right to go to trial. Regarding sentencing, Defendant is aware that 18 U.S.C. § 3742 generally affords a defendant the right to appeal the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal any sentence within or below the Court-determined guidelines range. Defendant also knowingly waives the right to challenge the sentence imposed in any motion pursuant to 18 U.S.C. § 3582(c)(2) and in any collateral attack, including, but not limited to, a motion brought pursuant to 28 U.S.C. § 2255 and/or § 2241. However, no waiver of the right to appeal, or to challenge the adjudication of guilt or the sentence imposed in any collateral attack, shall apply to a claim of involuntariness, prosecutorial misconduct, or ineffective assistance of counsel. Likewise, the government waives the right to appeal any sentence: (i) within or above the Court-determined guidelines range; or (ii) below such guideline range if the government has moved for a downward departure pursuant to U.S.S.G. § 5K1.1.

<u>Other Terms</u>

38.     Defendant agrees to cooperate with the United States in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the government. Defendant further agrees that any monetary penalties imposed by the Court will be subject to immediate enforcement as provided for in 18 U.S.C. § 3613, and submitted to the Treasury Offset Programs so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts but will not affect the periodic payment schedule.

39.     Defendant agrees to cooperate with the IRS in any tax examination or audit of defendant and her husband and defendant's partnerships or corporations that directly or indirectly relates to or arises out of the course of conduct defendant has acknowledged in this Plea Agreement, by transmitting to the IRS original records or copies thereof, and any additional books and records that the IRS may request. Nothing in this paragraph precludes defendant from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

40.     Should defendant engage in additional criminal activity after she has pled guilty but prior to sentencing, defendant shall be considered to have breached this Plea Agreement, and the government at its option may void this Plea Agreement.

<u>Conclusion</u>

41.     Defendant understands that the Information and this Plea Agreement have been or will be filed with the Court, will become matters of public record, and may be disclosed to any person.

42.     Defendant understands that her compliance with each part of this Plea Agreement extends until such time as she is sentenced, and failure to abide by any term of the Plea Agreement is a violation of the Plea Agreement. Defendant further understands that in the event she violates this Plea Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Plea Agreement, or may require defendant=s specific performance of this Plea Agreement.

43.     Defendant and her attorney acknowledge that no threats have been made to cause defendant to plead guilty.

44.     No promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement, and none will be entered into unless memorialized in writing and signed by all of the parties listed below.

45.    Defendant's Signature: I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending Information. Further, I fully understand all rights with respect to the provisions of the Sentencing Guidelines that may apply in my case. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this Plea Agreement, and I voluntarily agree to it.

Date: 3 · 8 · 22

Robin Smith
Defendant

46.    Defense Counsel Signature: We are counsel for defendant in this case. We have fully explained to defendant her rights with respect to the pending Information. Further, we have reviewed the provisions of the Sentencing Guidelines and Policy Statements, and we have fully explained to defendant the provisions of those guidelines that may apply in this case. We have reviewed carefully every part of this Plea Agreement with defendant. To our knowledge, defendant's decision to enter into this Plea Agreement is an informed and voluntary one.

Date: 3/8/22

W. David Bridgers

Date: 3 | 8 | 2 2

Ben M. Rose

22

Respectfully submitted,

MARK H. WILDASIN
United States Attorney

By: _____

AMANDA J. KLOPF
Assistant U.S. Attorney

/s/ Ben Schrader
BEN SCHRADER
Acting Deputy Chief, Organized Crime Unit

COREY R. AMUNDSON
Chief, Public Integrity Section

By: _____

JOHN P. TADDEI
Trial Attorney